Filed 11/12/13  P. v. Riggins CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

|  |  |
|---|---|
| THE PEOPLE, | C069494 |
| Plaintiff and Respondent, | (Super. Ct. No. 08F00290) |
| v. | |
| JAMES LAMAR RIGGINS et al., | |
| Defendants and Appellants. | |

In a story that is becoming all too familiar, rival gang members clashed over their perceived territory, words quickly escalated to gunfire, two young men are now dead, and a third was seriously wounded. Isidro Cedillo and Rigoberto Aguirre were killed, and Isidro's twin brother, Victor Cedillo, was shot multiple times. The confrontation began when the aggressor gang members hurled verbal threats outside the Cedillos' home. When the three young men came out of their home to confront the aggressors, one of the aggressors began shooting with a semiautomatic handgun, hitting all three of their perceived rivals, and killing two of them in front of their home.

The gunman, James Lamar Riggins, was found guilty of two counts of first degree murder with a multiple murder special circumstance, and one count of attempted murder.

1

As to each count, the jury found true allegations that he personally and intentionally discharged a firearm causing great bodily injury or death, and that the crime was committed for the benefit of a criminal street gang. As to the attempted murder count, the jury also found true the allegation that he personally inflicted great bodily injury. The trial court sentenced Riggins to life in prison without the possibility of parole plus 145 years to life in prison.

The jury found the other two defendants, Christopher Anthony Hernandez and Orlando Gabino Camacho, not guilty of the two first degree murder charges, but guilty of the lesser offenses of voluntary manslaughter. The jury found Hernandez and Camacho not guilty of attempted murder, but guilty of the lesser offense of attempted voluntary manslaughter. The jury found the arming enhancements untrue as to Hernandez and Camacho, but found true the allegations that the crimes were committed for the benefit of their gang. The trial court sentenced each of them to 30 years and 8 months in prison.

Defendants argue the trial court committed various evidentiary, instructional, and sentencing errors, and erred in imposing certain fees. They also argue they should have had access to juror information for the purpose of developing a motion for new trial. We shall remand for correction of the sentencing errors, but otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The crimes at issue in this case were motivated by gang animus. Aside from the fact that the victims and defendants associated with rival gangs, defendants blamed the victims for putting a fellow gang member behind bars.[1] That prior incident occurred in 2007. Twin brothers Victor and Isidro Cedillo were standing outside a liquor store when

---

[1] Police believed Victor Cedillo was associated with the Sureño street gang, and observed that Isidro Cedillo wore typical Sureño attire. Isidro had not had any contact with law enforcement. Police had no prior contact with Rigoberto Aguirre, and had no indication he was a gang member.

2

they saw Frank Camacho, a Varrio Diamond Sacra (VDS or Diamonds) gang member. Victor and Isidro knew Frank Camacho from high school. Frank Camacho called the brothers Scraps, which is a derogatory term for Sureño gang members. Victor and Isidro called Frank Camacho names as well. The brothers returned home, and shortly thereafter saw Frank Camacho in the front passenger seat of a car that was driving by, holding a gun and pointing it toward the Cedillos' house. Victor picked up a rock and threw it at the passing vehicle. Frank Camacho fired two shots and the car sped away. Frank Camacho was convicted of this crime. In December 2007, Victor Cedillo heard rumors that Frank Camacho was going to get out of jail and come kill him.

On January 11, 2008, Victor and Isidro were living in a house on 73rd Street with their mother Carmen Rivas, her boyfriend Adolfo Blancarte, Rigoberto Aguirre, Jonathan Ramirez, and others. They had recently moved to 73rd Street because the house they had been living in was being shot at in drive-by shootings. Their mother thought the 73rd Street house was in a calmer neighborhood.

On the night of the murders, January 11, 2008, defendants James "Stomps" Riggins and Christopher "Fat Boy" Hernandez were driving from one party to another in Riggins's Crown Victoria. Also in the car were Noemi Perez and Crystal Picasso. Riggins and Hernandez were VDS gang members. They drove down 73rd Street and saw three guys (the victims) outside a house. Hernandez said that the three should not be in his "hood" and yelled at them and threw up his index and middle fingers in the sign of the Diamonds. Riggins drove on to a nearby house where they picked up defendant Orlando "Silent" Camacho. Camacho was also a VDS gang member, and was the cousin of Frank Camacho.

After Camacho got in the car, defendants talked about wanting to fight the three guys that were outside the house on 73rd Street. They called them "Scraps." Hernandez said he wanted to go fight them. Camacho said he did not, but that he would have their backs. They drove back and parked on the corner of 73rd Street and 14th Avenue.

3

According to the females in the car, there was no talk about weapons, about ambushing, about killing, or about hurting anyone. However, the men did indicate they were going to fight the three guys outside the house on 73rd Street. Defendants got out of the car and walked down 73rd Street. Picasso and Perez stayed in the car.

Aguirre had just come home from work and was walking up to the house when one of the three defendants, later determined to be Riggins, stopped and talked to him. However, Aguirre did not speak English. After speaking to Aguirre, Riggins continued on down the street with his hands in his pockets. Aguirre went inside.

Isidro and Victor Cedillo were inside the house eating when Aguirre came inside. Everyone else in the house had gone to bed. The Cedillos heard people yelling outside the house when Aguirre came in. Aguirre told the Cedillo brothers in Spanish that he did not understand what the people were saying to him. Victor heard people on the lawn yelling out "scrap killer" and "14th Avenue," and "Diamonds." He looked outside and saw two guys (Camacho and Hernandez) on his front lawn.

Isidro Cedillo became angry and went outside, telling the intruders (Camacho and Hernandez), "Fuck your hood. I don't care where you guys claim." Camacho and Hernandez started throwing up gang signs and shouting gang nonsense. Aguirre went outside also, and Victor Cedillo followed them as soon as he put on his shoes. Victor did not see his brother or Aguirre pick up anything before they left the house, but he grabbed a folding chair to use to defend himself. Victor saw the two men who had been yelling run to a car, which he recognized as the one that drove by earlier, the occupants of which had thrown out gang signs. One of them reached into the back seat. Victor panicked because he did not know what the person was reaching for, and screamed at the other two to go back to the house. They all turned around and ran back toward the house.

Victor was still holding the chair. He did not see his brother or Aguirre throw anything at the other two men, or hit them with anything. As they ran toward their house, Victor saw a guy come out from behind a car and approach them from the opposite

4

direction. The guy reached toward his waist and pulled out a gun. He immediately started shooting. The gunman shot both Isidro and Aguirre as they ran away. He shot at Isidro six or seven times before turning the gun on Aguirre. Victor ran and hid behind a car, but not before the gunman (Riggins) shot him in the hand, the leg, the thigh, the lower back and the buttocks, for a total of eight bullet wounds. Victor heard Riggins run back toward where his car was parked on 14th Avenue.

Crystal Picasso, who was waiting in the front seat of Riggins's car, testified that when Camacho and Hernandez ran back to the car she saw two or three men chasing them with chairs in their hands. Picasso asked where Riggins was, and without answering, Camacho and Hernandez turned around to go back. Then Picasso heard a lot of gunshots. She thought the shooter probably emptied the gun. She guessed there were 10 shots, and it sounded like it was from the same gun. All three guys then came running back. Riggins said, "I know I got one, I know I got one." Hernandez said, "You should have let me do it. I would've got all of them." Then they laughed. Hernandez said he had "kept telling" Riggins to give the gun to him.

A witness on 14th Avenue, where Riggins's car was parked, saw the three defendants running from 73rd Street. They had their hands in the air, appeared boastful, and shouted something about "stone killers."

Riggins drove away fast. They headed for West Sacramento. At 12:15 a.m. a West Sacramento Police officer pulled Riggins over for speeding. Noemi Perez saw Riggins pass the gun to Camacho, who was in the back seat, and tell Camacho to run, but Camacho did not want to run. Because the officer was needed on another call, could not detect the odor of alcohol in the car, and did not see any signs of driver impairment, he let Riggins go at approximately 12:20 a.m. At approximately 12:30 a.m. he received a notification that the vehicle he had stopped was being sought in connection with a murder in Sacramento.

After being stopped by the police, Riggins drove the group to a house in West Sacramento, where a party was going on. Riggins took a shower. Noemi Perez saw Camacho and Hernandez passing the gun around at the party.

Stevie Ramirez testified that he was a former VDS gang member. Two days after the shooting, he told a detective investigating the case that Riggins told him that he (Riggins) had thrown his gun over the West Capitol Bridge. Ramirez told the detective that he did not want to talk because if he did, his life and his family's lives would be in jeopardy. He told the detective that he needed protection. On the stand, Ramirez claimed everything he told the detective was a lie.

Several witnesses to the murders testified they heard multiple gunshots. Some thought the shots all came from one weapon, but others thought they heard two different weapons. A total of 16 shell casings were collected at the scene. They were found in a half-circle pattern. All casings contained the same marking -- 9mm Win Luger. Six expended bullets were recovered, including one bullet fragment. All of the bullets collected were the same color. Five of the expended bullets were 9mm Luger jacketed soft-nosed bullets. The damaged bullet fragment could have been a 9mm Luger, but the fragment was too damaged to make a definite determination. All of the cartridge casings came from the same gun -- a semiautomatic or fully automatic firearm. It was possible, though not definitively determined, that the firearm which fired all of the cartridge casings fired all the bullets as well.

Only one chair, a metal folding chair, was found and collected from the scene. No guns were recovered from the scene, but a neighbor testified she saw a man take something from the vicinity of one of the victims.

Isidro Cedillo was shot in the left thigh, right thigh, and right knee. The fatal gunshot was to his left back over the shoulder blade, which damaged his lungs and aorta, and exited his chest. Isidro was not facing his shooter when he was shot. Aguirre died of

6

a single gunshot wound to his back that exited his front and damaged his pulmonary artery.

Riggins testified at trial. He admitted to being a VDS gang member. He admitted he was angry at the Cedillo brothers for sending Frank Camacho to jail for shooting at their house, and for calling the police and setting Riggins up. He admitted that he agreed to go fight the Cedillos and that he had a gun with him, but claimed he did not intend to use it. His defense was that when the Cedillos and Aguirre noticed him, they started yelling aggressively, then one pulled out a gun and shot at him twice. He was scared for his life, so he pulled out his gun and started shooting.

Hernandez also testified at trial. He never saw anyone with a gun. When he heard the gunshots, he ducked down and ran back to the car. He admitted Riggins had said that he thought he got one, and that he responded Riggins should have given him the gun because he would have got them all, but that was only because he did not want everyone to think he was a coward. He had not known anyone was going to shoot.

DISCUSSION

I

Exclusion of Perez's Double Hearsay Statement

Riggins and Hernandez argue their rights to present a defense, to confront the witnesses against them, and to due process were violated when the trial court excluded the hearsay statements of Hernandez and Camacho that the victims had thrown chairs at them. Camacho generally joins in the argument.

A. Underlying Facts

During cross-examination by Camacho's defense counsel, Noemi Perez was asked about a statement she had made to a defense investigator. She was asked whether she told the investigator that when Camacho and Hernandez returned to the car the first time, they said the other guys were throwing chairs and had bats. She said she did not remember. Camacho's defense counsel asked to approach.

7

Later, during cross-examination by Hernandez's counsel Perez was asked about the demeanor of Hernandez and Camacho when they first returned to the car. Counsel asked if they had appeared scared, to which Perez replied they had. Counsel then asked if they were excited or upset about what had happened. The trial court sustained the prosecutor's objection that the question was leading. Then counsel asked Perez to describe the demeanor of Camacho and Hernandez when they returned to the car. Perez replied that she did not remember.

Counsel refreshed Perez's memory of a prior statement she had made to the defense investigator. When asked the question again, she indicated Camacho and Hernandez had appeared tired and scared. Counsel asked if they had said anything, and she replied, "No." Counsel then asked, "At some point, did Christopher or Orlando say to you that the other guys --[.]" The prosecutor objected on hearsay grounds, and the objection was sustained following an unreported discussion.

B. Trial Court's Ruling

In a later discussion on the record, the trial court indicated counsel for Hernandez had tried to use Perez's earlier statement to investigators, that Camacho and Hernandez said the victims had thrown chairs at them and that they had bats, to impeach her statement that she could not now remember them saying anything. The trial court stated:

> "There are two points of analysis. One was that because she doesn't remember making that statement, it is hearsay inconsisten[cy] and therefore it comes in through the rule on inconsistency.

> "But in this case the underlying statement itself is offered for the truth of the matter asserted and for that second leg they were offering excited utterance."

The trial court then noted that the evidence in support of the defense's claim that the statement constituted an excited utterance was that the defendants were tired and scared when they returned to the car. The trial court agreed that Perez's failure to remember on the stand was inconsistent with her earlier statement. However, as to the

8

excited utterance, the court found that it could consider whether the declarants had a true suspension of their ability to filter their statements, or whether there was some motivation for the statement. The court concluded: "when I look at [the] quite candidly thin description of their excitement or fear when they entered the car, and also consider the motivation to provide a justification for subsequent conduct, it doesn't have the kind of suspension of filtering process such that it is appropriately an exception to the hearsay rule."

The request to admit the statement was renewed after some evidence was admitted that Victor Cedillo had been armed with a chair. Specifically, Victor testified he had taken a chair with him when he went outside and Crystal Picasso's interview with police was admitted in which she stated "It looked like they had like a chair or bat or something like that." During the renewed request, it was asserted that Hernandez was the one who stated they had been chased with bats.

The trial court confirmed its earlier ruling, stating it had taken into account Hernandez's gang involvement and prior involvement in a couple of confrontations when evaluating Hernandez's state of mind when he made the statement. The court also considered Noemi Perez's testimony that the three defendants went to the house to fight, and the evidence from which an inference could be made that Hernandez knew that Riggins had a gun. The court also noted that Noemi Perez was asked whether Hernandez made any statement while he was in a state of fright, and she answered, "no."

In confirming its earlier ruling, the trial court stated:

> "This is a statement that would be exculpatory for subsequent conduct, indeed, virtually immediately thereafter, these two gentlemen, both of them Mr. Hernandez and Mr. Camacho join in the effort again or rejoin the incident knowing of course that Mr. Riggins is armed and knowing that they went there to fight.
>
> "Consistent with the cases I've cited, it's a factor that you can consider in evaluating whether or not this is truly a spontaneous exclamation or something that is said to explain or justify past conduct or

9

subsequent conduct, an exculpatory statement that a reasonable person would make.

"When I look at the totality of these factors and the case law that I referenced, I don't see the kind of spontaneous exclamation from unexpected, untoward, exciting event that occurs that is made without reflection or without the reasonable likelihood or possibility certainly that's being made for other purpose[s]. So I confirm my earlier ruling."

C. Analysis

A spontaneous declaration or excited utterance is an exception to the hearsay rule. It is a statement that "(a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." (Evid. Code, § 1240.)

The requirements for an admissible spontaneous declaration are: "(1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i. e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it." (*Showalter v. Western Pacific R. R. Co.* (1940) 16 Cal.2d 460, 468.)

"The crucial element in determining whether an out-of-court statement is admissible as a spontaneous declaration is the mental state of the speaker." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 811.) The speaker's mental state must be such that the speaker is dominated by nervous excitement and speaks without reflecting, contriving, or misrepresenting. (*People v. Lynch* (2010) 50 Cal.4th 693, 751-752, abrogated in part on other grounds as stated in *People v. McKinnon* (2011) 52 Cal.4th 610, 637-638.) A defendant's self-serving statements are inherently suspicious. (*People v. Frierson* (1991) 53 Cal.3d 730, 745-746.)

We review the trial court's decision whether to admit a spontaneous statement for abuse of discretion. (*People v. Stanphill* (2009) 170 Cal.App.4th 61, 73.) "[T]he

10

discretion of the trial court is at its broadest" when it determines whether an utterance was made while the declarant was still in a state of nervous excitement. (*People v. Poggi* (1988) 45 Cal.3d 306, 319.)

The trial court focused on whether Hernandez's statement was a spontaneous declaration because it agreed with the defense that Perez's failure to remember his comment was inconsistent with her prior statement. The trial court reasoned that while an incident involving chair throwing might create some excitement, it was not of the same character as the nervous excitement that Hernandez might be expected to experience had the victims been shooting. The court found the evidence of any nervous excitement "thin." Additionally, Hernandez was a gang member who had been involved in confrontations before, and understood that he and his codefendants were going to the house to fight. There was also evidence from which the trial court could reasonably conclude that Hernandez knew Riggins had taken a weapon to the fight.

All of these factors weighed against a determination that Hernandez was so excited by being chased by two people with chairs or bats that his reflective powers were in abeyance when he made the statement. This coupled with the fact that the statement was exculpatory and self-serving was enough for the trial court to correctly determine that Hernandez did not have the mental state to make a spontaneous declaration. The trial court did not abuse its broad discretion in excluding Hernandez's hearsay statement.

Turning to the defendants' constitutional arguments, they claim with little explanation that the exclusion of Perez's statement to an investigator violated their federal Fifth and Sixth Amendment rights to present a defense, their Sixth Amendment right to confront and cross-examine the witnesses against them, and their Fourteenth Amendment right to due process. The arguments have no merit because defendants forfeited the constitutional claims by failing to raise them below, because there was no error on which to base the constitutional claims, and because the exclusion of evidence pursuant to state law did not violate the defendants' right to present a defense.

11

The trial court specifically informed the parties that it would federalize all hearsay objections, but "[a]ny other objections that raise constitutional issues, you'll have to state it, what it is so I know if you are asserting some due process issue or something else." The parties stated they had no objection to proceeding in that fashion. Defendants failed to raise below any objections on the federal constitutional grounds they now claim. The constitutional objections were not preserved for appeal. (*People v. Raley* (1992) 2 Cal.4th 870, 892.) Hernandez's reply brief argues *People v. Partida* (2005) 37 Cal.4th 428 does not preclude the argument on appeal. Had we determined the trial court's ruling on the objection actually raised at trial was erroneous, we could consider the consequences of that error, including whether the error was so serious as to violate due process. (*Id.* at p. 437.) However, as we conclude that the trial court did not abuse its discretion in excluding Perez's statement, there is no error on which to base defendants' constitutional claims. (*People v. Roybal* (1998) 19 Cal. 4th 481, 506, fn. 2.)

Finally, the exclusion of Perez's statement did not violate the defendants' rights under the Fifth, Sixth, and Fourteenth Amendments. " 'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [constitutional] right to present a defense. . . .' [Citation.] [¶] It follows, for the most part, that the mere erroneous exercise of discretion under such 'normal' rules does not implicate the federal Constitution." (*People v. Cudjo* (1993) 6 Cal.4th 585, 611.)

Furthermore, evidence in support of defendants' self-defense theory was not completely excluded. Victor Cedillo testified he armed himself with a chair before going outside. Crystal Picasso testified she saw two or three of the victims holding chairs and chasing the defendants. Her prior interview statement was admitted into evidence, wherein she stated she thought the victims had chairs or bats in their hands. She testified that Hernandez and Camacho had appeared scared when they came running back to the car. Hernandez testified that he saw Victor come rushing out with a chair and figured they were going to get hit, so he and Camacho ran away. A witness heard a folding chair

hit the ground. Riggins testified the victims had "chairs and stuff" in their hands and were yelling at him. A chair was found at the scene.

Because evidence the victims were armed with at least one chair and possibly with bats was not completely excluded, the exclusion of Perez's statement did not interfere with defendants' right to present a defense. (*People v. Cunningham* (2001) 25 Cal.4th 926, 999.) Defendants' constitutional arguments regarding the exclusion of Perez's statement fail.

## II
## Evidence of Uncharged Act (Camacho)

The prosecutor brought a motion in limine to admit evidence of defendants' gang involvement. The prosecutor proposed to admit the evidence both in support of expert opinion and for the truth of the matter for purposes of motivation and for the gang enhancement (Pen. Code, § 186.22, subd. (b)). The particular incident to which Camacho's argument is directed occurred in July 2007, approximately six months prior to the crimes at issue in this case.

The prosecutor initially stated that she would call the officer who responded to a shooting, and who found defendant Camacho with his cousin Frank Camacho and two other validated gang members in a bedroom. Frank Camacho was hiding under the bed, defendant Camacho was sitting on the bed, and the gun was also found in the bed. Defendant Camacho's hands were bleeding.

The trial court initially ruled that it would preclude evidence of the shooting and of defendant Camacho's hands bleeding. However, it overruled the objection to admission of the incident because it was recent in time, the probative value was significant for intent and motivation (both general motivation and the intent to assist a criminal street gang), and because the prejudicial effect was comparatively minor.

Camacho's counsel requested the following instruction, which the trial court gave with respect to evidence of alleged prior incidents of misconduct:

13

"This evidence can be considered by you consistent with instructions I'll give you later in evaluating whether or not the defendants intended to promote or further criminal street gang activity, or whether or not that intent serves as a motivation to engage in conduct that was engaged in as alleged by the People.

"You cannot consider this evidence to show that any one of these defendants have a propensity for violence or a character trait of criminal activity, that would be improper and [an] incorrect use of this evidence.

"I'll give more instructions on this issue. You can consider it as it goes to intent to participate for motive in a criminal street gang, or as that intent relates to motivation to engage in conduct that was alleged, but you can't consider it to show that [they have a] propensity for violence or character trait of being criminal in nature, that's inappropriate."

Camacho then filed a motion in limine objecting to the admission of the incident pursuant to Evidence Code sections 352 and 1101. The trial court ruled on the matter after reviewing the police report of the prior incident. The court recounted the facts from the police report for the record. A group of Hispanic men had been "hanging out" on a car when another vehicle drove by. One of the Hispanic men shouted "gang war" and shooting commenced. Officers were nearby and responded almost immediately. Inside the vehicle located in front of the residence was a bloody handprint. Officers followed a trail of blood from the seat of the car to the front door of the house. The homeowner consented to a search of the house. A number of people were found in a bedroom, including defendant Camacho who was bleeding profusely from a significant injury to his hand. He denied any knowledge of the shooting. Defendant's cousin Frank Camacho was found hiding under the bed. In the bed was a firearm that had recently been discharged. No arrests were made and no prosecution was undertaken. The police could not determine what had occurred.

The trial court expressed that the prejudicial effect of admission would be that the jury might speculate that defendant Camacho was the instigator of the shooting, that he fired the gun unlawfully, or that he engaged in substantive criminal misconduct. The

14

court expressed the opinion that a fuller version of the facts would actually mitigate any prejudice, because it would raise an inference that Camacho was not the aggressor.

The court found that the evidence had probative value as to defendant Camacho's cooperation and collaboration with members of a gang, and that any prejudicial effect because of speculation that he did something criminal in nature did not outweigh the probative value. The court ordered that the prosecution not argue or present to the jury any claim that Camacho had committed some illegal act relating to the prior shooting incident, and that the expert not give any such opinion.

Thereafter, Detective Don Schumacher gave his expert opinion that defendant Camacho was a member of the Diamonds gang. The opinion was based in part on the incident in July 2007. Immediately after Detective Schumacher's testimony regarding the July 2007 incident, the trial court gave the following limiting instruction:

> "All of this evidence however cannot be considered as evidence that these gentlemen have propensity for violence or a bad character such that they are more likely have committed the crimes which are charged here.

> "It can only be considered as to whether or not they have intent or motivation to engage in conduct on behalf of a criminal street gang."

Another responding officer also testified regarding the July 2007 incident, after the trial court ruled that any references to "male Hispanic subjects" be deleted. He also testified about the car with a bloody handprint, following the blood trail to the house, locating a bleeding defendant Camacho inside a bedroom of the house, finding a recently fired weapon in the bedroom, finding defendant Camacho's cousin Frank Camacho hiding under the bed, and hearing defendant Camacho claim to have hurt his hand when he punched a fence.

Camacho argues the trial court erred in admitting evidence of the July 2007 incident because it was not relevant to the murder charge or to the gang enhancement, and even if it were relevant to the gang enhancement, it was unnecessary in light of "the

15

plethora of evidence presented on appellant's gang affiliation and association with other gang members." Camacho further argues that assuming the evidence was properly admitted under Evidence Code section 1101, subdivision (b), which permits the admission of prior acts evidence if it is relevant to prove a fact such as motive or intent, it should have been excluded under Evidence Code section 352, which gives the trial court discretion to exclude evidence if its probative value is substantially outweighed by the danger of undue prejudice.

Rulings regarding relevancy and the determination whether the probative value of the evidence is substantially outweighed by the probability of undue prejudice are reviewed under an abuse of discretion standard. (*People v. Lee* (2011) 51 Cal.4th 620, 643.) That standard requires this court to uphold the admission of evidence unless we find the trial court acted arbitrarily, capriciously, or in a patently absurd manner, and the admission of the evidence resulted in a manifest miscarriage of justice. (*People v. Foss* (2007) 155 Cal.App.4th 113, 125.)

Evidence of the July 2007 incident was relevant both to the murder and attempted murder charges and the gang enhancements. The prosecution presented the case as a gang crime motivated by the desire to eliminate competing gang members from the neighborhood. Camacho's attorney, on the other hand, defended him by claiming Camacho had not lived in the neighborhood for years, did not know the victims had moved into the neighborhood, was not aware until he got into Riggins's car that Riggins and Hernandez intended to go fight with "some Mexicans over on 73rd Street," and had no idea Riggins was armed, believing they were going to have a fistfight only.

Evidence of Camacho's gang affiliation as evidenced by his previous gang interactions was material to the prosecution's case because it showed the nature of Camacho's commitment to the gang, tended to refute Camacho's claim that he did not know Riggins had a gun, and that he had no motive to fight the victims. The July 2007 incident was particularly probative because, like the present case, it involved a territorial

16

dispute between rival gangs. Because the prior act involved a shooting, and because after the shooting defendant Camacho was found in a room with other gang members and a recently fired gun, the incident was material to the prosecution's position that Camacho participated in a gang territorial dispute knowing that Riggins was armed.

The prejudicial effect of the evidence was not significant. Evidence is considered unduly prejudicial "if it tends to evoke an emotional bias against the defendant as an individual and has a negligible bearing on the issues." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1091.) Prejudicial evidence is evidence that inflames the emotions of the jury, motivating them to reward or punish one side because of the jury's emotional reaction to the evidence, rather than evaluating the evidence for the point on which it was relevant. (*Ibid*.) Evidence of the July 2007 incident was unlikely to inflame the passions of the jury because unlike the present case, the July 2007 case did not result in any deaths. Furthermore, as the trial court indicated Camacho may have been the victim in the prior incident.

The trial court repeatedly instructed the jury on the limited purpose for which it could use the evidence. We presume that the jury followed these instructions. (*People v. Delgado* (1993) 5 Cal.4th 312, 331.) For all of these reasons, the trial court did not abuse its considerable discretion when it allowed admission of the July 2007 incident.

III
CALCRIM No. 362

Riggins, joined by Hernandez, claims the trial court erred when it gave the following instruction:

> "If defendant James Riggins or defendant Christopher Hernandez made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show that they were aware of their guilt of the crime and you may consider it in determining their guilt.
>
> "You may not consider the statement in deciding any other defendant's guilt. If you conclude the defendant James Riggins or

17

defendant Christopher Hernandez made the statement, it's up to you to decide its meaning and importance.

"However, evidence that the defendant made such a statement cannot prove guilt by itself."

The substance of their argument is that the instruction established a "permissive presumption" of guilt. They claim that the predecessor instruction on consciousness of guilt, CALJIC No. 2.03, "contained judicially approved language that did not create a presumption of guilt as to mental state, but CALCRIM No. 362 no longer contains that language."

CALJIC No. 2.03 stated:

" 'If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider such statements as a circumstance tending to prove a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your determination.' " (*People v. Page* (2008) 44 Cal.4th 1, 49, fn. 23.)

The defendant in *People v. Crandell* (1988) 46 Cal.3d 833 (*Crandell*) (overruled on other grounds in *People v. Crayton* (2002) 28 Cal.4th 346, 364-365), like the defendants here, argued that the instruction erroneously permitted the jury to draw an impermissible inference without foundation concerning his mental state. (*Crandell, supra*, at p. 871.) The defendant in *Crandell* argued that because a defendant's guilt is the ultimate determination of the truth or falsity of the criminal charges, the jury might "view 'consciousness of guilt' as equivalent to a confession, establishing all elements of the charged murder offenses, including premeditation and deliberation, though defendant might be conscious only of having committed some form of unlawful homicide." (*Id*. at p. 871.)

The Supreme Court's response was that Crandell's "fear that the jury might have confused the psychological and legal meanings of 'guilt' is unwarranted. A reasonable juror would understand 'consciousness of guilt' to mean 'consciousness of some

18

wrongdoing' rather than 'consciousness of having committed the specific offense charged.' " (*Crandell, supra*, 46 Cal.3d at p. 871.) The court concluded that the instruction did not address the defendant's mental state at the time of the offense and did not compel the jury to draw any impermissible inferences with regard to the defendant's mental state. (*Ibid.*)

CALCRIM No. 362 has replaced the phrase, "consciousness of guilt" with the phrase, "aware[ness] of [their] guilt of the crime . . . ." Defendants argue this means that under the new instruction the jury is effectively being told that it may consider the defendants' awareness of their guilt of the crime as consciousness of their legal guilt as to the specific offense. We disagree.

As we stated in *People v. McGowan* (2008) 160 Cal.App.4th 1099, 1104, the differences between CALJIC No. 2.03 and CALCRIM No. 362 are "minor" and none of the differences "is sufficient to undermine our Supreme Court's approval of the language of these instructions." As with the instruction given in *Crandall*, *supra*, 46 Cal.3d at p. 871, the jury would not have confused the psychological and legal meanings of "guilt" of the crime. The jury would have understood that false statements were not the equivalent of a confession, and were not themselves sufficient to prove guilt. No error appears in the giving of CALCRIM No. 362.

IV
Natural and Probable Consequences Instruction

Hernandez and Camacho claim their convictions for voluntary manslaughter and attempted voluntary manslaughter must be reversed because the instruction on natural and probable consequences was not supported by sufficient evidence. We disagree.

The trial court instructed the jury that it could find Camacho and Hernandez guilty of murder or manslaughter either because they aided and abetted the murder committed by Riggins with the intent that Riggins commit murder or manslaughter, or because they intended to commit the offense of disturbing the peace or simple assault, and under the

19

circumstances murder or manslaughter was a natural and probable consequence of the intended offense.

After the jury began deliberations, the jurors sent several questions to the trial court regarding aiding and abetting liability. First, they asked whether, if they found Camacho and Hernandez guilty of aiding and abetting, they could find them guilty of a lesser charge. The trial court responded with the following instruction:

> "Yes, an aider and abettor may be found guilty of a lesser included crime than that committed by the perpetrator.
>
> "However, if you find that those aiding and abetting had the same intent as the perpetrator when the greater crime was committed, then they are guilty of the same greater crime.
>
> "If, you find, however, that the crime committed by the perpetrator was not a reasonably foreseeable (natural and probable) consequence of the criminal act originally aided and abetted, but that a lesser included offense, committed by the perpetrator during the commission of the greater included crime, was a reasonably foreseeable consequence, you may find the aider and abettor guilty of that lesser included crime.
>
> "The Court cannot accept a verdict of guilty for any individual Defendant on a lesser included crime unless the jury has found that Defendant not guilty of the greater crime or crimes."

Later, in response to the above instruction, the jury asked if manslaughter was a lesser included offense to first degree murder. This question came after the jury had returned the verdict against Riggins. The trial court gave the following response:

> "Are you asking me, if an aider and abettor, under the natural and probable consequences theory, can be convicted of a lesser offense such as manslaughter, when the perpetrator commits 1st Degree Murder?
>
> "If so, the answer is yes, as long as the lesser included offense committed by the perpetrator, during the commission of the greater offense, was a reasonably foreseeable consequence.

"Please refer to CALCRIM 403 and specifically the elements numbered 1, 2, and 3. Also, please refer to CALCRIM 640 and 3517.[2]

"If not, please re-ask your question."

The jury then asked, referencing their initial question, the following two questions:

"If you go to a fight not knowing that a murder is going to occur [and] one does, can you be held accountable for the crime?

". . . Can you get to aiding [and] abetting by 401 and/or 403?"

CALCRIM No. 401, referenced in the jury's question, was the instruction on aiding and abetting based on the knowledge and intent to aid and abet the perpetrator. CALCRIM No. 403 was the instruction on natural and probable consequences.

The trial court answered by telling the jury that it seemed to be confused as to the different theories of aiding and abetting. The court re-read portions of CALCRIM Nos. 401 and 403. The court then explained that under CALCRIM No. 401 the perpetrator and aider and abettor share the same intent, but under CALCRIM No. 403, the perpetrator and aider and abettor do not share the same intent. The court instructed that the jury could get to aiding and abetting by CALCRIM Nos. 401 and 403 because they set out different legal theories.

The complained-of instruction is CALCRIM No. 403, the natural and probable consequences theory. Defendants claim the trial court should not have given this

---

**2** CALCRIM No. 403 is the instruction on natural and probable consequences. Elements 1, 2, and 3 instructed that defendant must be guilty of disturbing the peace or simple assault, during the commission of which Riggins committed murder and attempted murder or a lesser included offence, and under the circumstances, a reasonable person would have known that murder and attempted murder or any lesser included offense were a natural and probable consequence of disturbing the peace or simple assault. CALCRIM No. 640 informed the jury that it must find defendants not guilty of first degree murder before determining their guilt of second degree murder, and must find them not guilty of second degree murder before determining their guilt of voluntary or involuntary manslaughter. CALCRIM No. 3517 instructed that the defendants could not be found guilty of both the greater charged crime and the lesser crime.

21

instruction because there was insufficient evidence to support this theory of guilt, as the shooting did not result *directly* from the intended crimes of disturbing the peace or simple assault, but from the victims' *unanticipated* conduct of rushing out of their house armed with chairs, and because there was no evidence to establish that defendants knew prior to the shooting that Riggins had a gun.

"The test for determining whether instructions on a particular theory of guilt are appropriate is whether there is substantial evidence which would support conviction on that theory. [Citation.] To determine whether there is substantial evidence to support a conviction we must view the record in a light most favorable to conviction, resolving all conflicts in the evidence and drawing all reasonable inferences in support of conviction. We may conclude that there is no substantial evidence in support of conviction only if it can be said that on the evidence presented no reasonable fact finder could find the defendant to be guilty on the theory presented. [Citation.]" (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 528-529.) On this record we find ample evidence for defendants' manslaughter conviction as a natural and probable consequence of the crimes of disturbing the peace or simple assault, motivated as they were in this case by a gang turf war.

Defendants' claim that the shooting was the result of the victims' own conduct, and that they could not have anticipated the victims would rush out of their home armed with a chair or chairs when confronted by defendants is not worthy of serious consideration. As previously stated, there was evidence that the defendants were VDS gang members, and that the victims were associated with a rival gang. There was expert testimony that in Sacramento the Diamonds are territorial and want to control the neighborhoods they live in. One of the past Diamond gang crimes occurred when Frank Camacho, defendant Camacho's cousin, drove by the Cedillo brothers' (the victims in this case) house and pointed a gun at them. Victor responded by throwing a rock at the passing car, and Frank Camacho fired two shots at him.

22

Another past occurrence involved defendant Hernandez, who confronted the victim outside the house where the victim was staying, and demanded to know what gang the victim was from. The victim responded by starting a fistfight, and Hernandez flashed a gun at the victim. In the earlier referenced incident involving defendant Camacho, there was an exchange of gunfire when a car carrying gang members drove by a house.

Past experience alone would have informed defendants that the likely result of confronting members of a rival gang at their home would result in an aggressive response by the rival gang members, and they should have anticipated such a response.

Defendants' argument that the evidence did not establish that they knew prior to the shooting that Riggins had a gun is contrary to the record. As stated, we draw all reasonable inferences in favor of conviction. In this case there was evidence Crystal Picasso told police she heard Hernandez say that he "kept telling" Riggins to give him the gun. It is reasonable to infer from this that Hernandez knew about the gun at least during the incident. Hernandez's statement, also relayed by Picasso to police, that he "would've got all of them" is evidence from which we may infer his intent.

Furthermore, the gang expert testified that when members intended to confront rival gang members, a gang that had access to firearms would take a firearm to the confrontation. VDS had access to firearms. If one person had a gun, the others were likely to know it.

The issue is whether under all of the circumstances "a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant." (*People v. Nguyen, supra*, 21 Cal.App.4th at p. 531.) Defendants' position in this equation includes the fact that they are affiliated with a street gang and steeped in gang culture. "When rival gangs clash . . . verbal taunting can quickly give way to physical violence and gunfire. No one immersed in the gang culture is unaware of these realities,

23

and we see no reason the courts should turn a blind eye to them." (*People v. Montes* (1999) 74 Cal.App.4th 1050, 1056.)

The trial court did not err in giving the natural and probable consequences instruction.

V

Denial of Access to Juror Information

All defendants argue the trial court abused its discretion in refusing a request to release juror information in an attempt to support a motion for new trial based on juror misconduct.

Camacho's attorney made his closing argument on August 18, 2011. The jury returned its verdict on August 31, 2011. On October 3, 2011, approximately one and one-half months after the fact, and a full month after the verdict was rendered, one of Camacho's cousins filed the declaration that was the basis of the request to release juror information. The declaration stated that on the day Camacho's attorney delivered his closing argument, the cousin was having lunch at the same restaurant as three of the jurors in the case. The declaration named the jurors by juror number. The cousin stated that she overheard the jurors talking about Camacho's lawyer's closing argument. They said, "The look on number 1's face was priceless." They talked about Camacho's lawyer's speech, saying that it was "flowing nicely" but was "frustrating because he stuttered at times." The cousin stated that she did not know to whom the jurors were referring as "number 1," but she assumed it was her cousin. On the basis of this declaration, Camacho claimed the jurors were engaged in misconduct because they discussed the case outside the jury room.

In denying the request, the trial court made the following comments:

"[T]here was a period here of seven weeks or more between the heard conversation and the signing of the declaration.

24

"There was also a period of roughly two weeks after the conversation was heard before and during which the Court was in session. The jury was deliberating during which there was no disclosure of what was heard.

"And then the declaration pops up three days before the time set for judgment and sentence. The timing sequence in the connection there of the declarant as a family member causes the Court pause with regard to accuracy and completeness.

"But assuming that it is accurate, it's just not the kind of conduct that constitutes a reasonable basis to proceed here.

"It is arguably a technical violation not to talk about any subject matter or aspect of the trial, but that part which is clearly related to the trial concerns the manner of presentation. It is speaking style of the attorney, flowing nicely, stuttering at times without any substantive reference to content or issues or subject matter really about the case itself.

"That part of the statement, 'the look on number one's face was priceless', is extremely difficult, indeed, impossible to understand. The dominant inference because we refer to our jurors as juror number 1 and juror number 2 based on the seat of occupancy is that that's a referenced juror, but it could reference anyone including me.

"You just don't know. But when you look at it as a whole, there is just not the kind of inference you can draw that there's misconduct of a character that would improperly influence a jury verdict. [¶] . . . [¶]

"I would note in this case because the Court has a balancing obligation under the *Rhode's* case that this is the type of case involving serious gang activity, gang tension, instances where the witnesses were speaking in some instances with what would appear to be fear.

"This is the type of case that the public policy of preserving the privacy and confidentiality of jurors and not exposing them to the possible future questioning or disturbance becomes a public policy matter that's extremely important."

Defendants claim the trial court abused its discretion when it denied access to juror information, and that such abuse of discretion deprived them of their federal Sixth and Fourteenth Amendment right to trial by an impartial jury free of misconduct. The claim has no merit.

25

Following the verdict in a criminal case, the defendant or his counsel may petition the court for access to sealed personal juror identifying information, including names, addresses, and telephone numbers, for the purpose of developing a motion for new trial or for any other lawful purpose. (Code Civ. Proc., §§ 206, subd. (g), 237, subd. (a)(2).) The petition must be supported by a declaration establishing good cause for the release of the information. (Code Civ. Proc., § 237, subd. (b).) If the petition and declaration establish a prima facie showing of good cause and there is no compelling interest against disclosure, including protecting jurors from threats or danger of physical harm, the trial court must set the matter for a hearing to determine whether to disclose the information. (*Ibid.*)

A prima facie showing of good cause is "a sufficient showing to support a reasonable belief that jury misconduct occurred, that diligent efforts were made to contact the jurors through other means, and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial." (*People v. Rhodes* (1989) 212 Cal.App.3d 541, 551-552, superseded by statute, but still setting forth the applicable test, as stated in *People v. Carrasco* (2008) 163 Cal.App.4th 978, 990.) Even if the petition sets forth a prima facie showing of good cause, the trial court may not set the matter for a hearing if it finds a compelling interest against disclosure. (Code Civ. Proc., § 237, subd. (b).)

We review the denial of a petition under the deferential abuse of discretion standard. (*People v. Carrasco, supra*, 163 Cal.App.4th 978, 991.) We find no abuse of discretion in this case because we conclude the trial court reasonably found good cause had not been established. As the trial court noted, assuming Camacho's cousin's declaration was accurate and truthful, the violation was a technical one only. The jurors did not discuss anything substantive about the case. The jurors' conduct was not " 'of such a character as is likely to have influenced the verdict improperly' . . . ." (*People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1322, citing Evid. Code, § 1150, subd. (a).)

26

Defendants' argument that if the jurors talked about something nonsubstantive, they might have had a more substantive discussion that was not overheard, is mere speculation and does not rise to the level of prima facie evidence of good cause.

Additionally, even if Camacho had made a prima facie showing of good cause, the court acted well within its discretion in determining that there was a compelling interest against disclosure. Code of Civil Procedure, section 237, subdivision (b) provides that the trial court, "shall not set the matter for hearing if there is a showing on the record of facts that establish a compelling interest against disclosure. A compelling interest includes, but is not limited to, protecting jurors from threats or danger of physical harm."

As the trial court noted, the case involved serious gang activity, and the witnesses appeared to be testifying with fear. There is evidence in the record regarding the violence of gang culture, how gang culture permeates the community, and how gangs intimidate non-gang members into defying the criminal justice system. In this particular case the gang defendants went to the home of their victims and shot and killed two members of the household. As this court stated in *Rhodes*, "Few would quarrel with the proposition that the willingness of people to serve on a jury would be chilled by the knowledge that, once deliberations are complete, a party to the action may have unlimited access to the home address and telephone number of each juror." (*People v. Rhodes, supra*, 212 Cal.App.3d at p. 548.) Thus, the release of juror information in cases such as this could jeopardize the ability of the criminal justice system to prosecute cases involving criminal gangs.

Because of the failure of defendants to establish good cause, and the compelling interest against disclosure of juror identifying information in this case, the trial court did not abuse its discretion in refusing to set the matter for hearing.[3]

## VI
## Sentencing Issues

A. Riggins's Sentence for Attempted Deliberate and Premeditated Murder

The trial court sentenced Riggins to 25 years to life on count three (attempted deliberate and premeditated murder). He argues the trial court should have imposed life in prison with the possibility of parole. The People concede and we agree.

Penal Code, section 664, subdivision (a) provides that the punishment for attempted willful, deliberate, and premeditated murder is imprisonment for life with the possibility of parole. An unauthorized sentence is subject to correction on appeal, and we shall direct the trial court to modify the sentence on count three to life in prison with the possibility of parole.

B. Riggins's Sentence Under the Gang-Enhancement Statute

The trial court sentenced Riggins to three 15-year-to-life terms pursuant to Penal Code, section 186.22, subdivision (b)(5). He argues the correct sentence for the enhancement where the substantive offense carries a life sentence is a minimum parole eligibility period of 15 years, not a separate indeterminate term. The People concede and we agree.

Penal Code section 186.22, subdivision (b)(5) provides that where the enhancement is to a felony "punishable by imprisonment in the state prison for life [the defendant] shall not be paroled until a minimum of 15 calendar years have been served."

---

[3] We reject defendants' argument that reversal is required because of cumulative prejudice from the collective errors because there is no predicate error relating to the determination of defendants' guilt on which to base such a claim.

28

*People v. Ortiz* (1997) 57 Cal.App.4th 480, 485-486, held that this language was "clear and unambiguous" and that the "enhancement is not an additional determinate term, but an extended parole eligibility date."

We shall order the sentence modified accordingly.

C. Sentence for Count Three Gang Enhancement

Hernandez and Camacho argue the trial court erred when it imposed a three-year four-month sentence on the gang enhancement to count three, attempted voluntary manslaughter. The People concede and we agree. The trial court imposed sentence on the gang enhancement for count three as if the underlying crime, attempted voluntary manslaughter, were a violent felony, but it is merely a serious felony for purposes of the gang enhancement.

Penal Code section 186.22, subdivisions (b)(1)(B) and (b)(1)(C) provide that the additional term for a serious felony is five years and the additional term for a violent felony is 10 years. The trial court imposed an additional term of three years and four months (one-third of 10 years) on the gang enhancement to count three.

Attempted voluntary manslaughter is not a violent felony as defined in subdivision (c) of Penal Code section 667.5. It is, however, a serious felony pursuant to subdivisions (c)(1) and (c)(39) of Penal Code section 1192.7. The trial court should have imposed a one-year and eight-month sentence (one-third of 5 years). We shall order the sentence modified accordingly.

D. Court Aware of Discretion to Strike Gang Enhancement

Camacho, joined by Hernandez, argues the case must be remanded for resentencing because the trial court imposed punishment for the street gang enhancement based on the erroneous belief the enhanced punishment was mandatory.

Defendants' argument is based on language the trial court used when it imposed sentence. In sentencing Camacho and Hernandez, the trial court began with the following comments regarding their gang involvement:

29

"Fundamentally the weight of the evidence here is it was stated understood they were going to beat up some Surenos. They went to this house in the middle of the night where Surenos lived.

". . . There's ample evidence of extensive gang involvement and expert opinion rendered that in that context gang members customarily know about the presence of a firearm and would have a firearm present when undertaking such tasks . . . .

"Their juvenile record is surprisingly similar in a way. They both show not just a history of conduct and criminal conduct, but criminal conduct involving gangs. Both were on probation at the time that this incident occurred. Both had sustained juvenile petitions of crimes that were violent in form, particularly, as you look at the evidence as it was adduced here."

As to the gang enhancement on count one, the trial court ruled: "As to the 186.22 [subdivision] (b)(1) allegation, which was found true, the defendants' sentence is enhanced by a separate consecutive term of ten years *as mandated*." (Italics added.) As to the gang enhancement on count two, the trial court ruled: "As to the section 186.22 [subdivision] (b)(1) allegation, which was found true, the defendants, this is as to both defendants, is enhanced by a separate consecutive term of three years four months *as mandated* for a total as to this count of five years four months." (Italics added.) As to the gang enhancement on count three (attempted murder) the trial court ruled: "as to the 186.22 [subdivision] (b)(1) allegations which are true, found true, the defendants are sentenced to a separate consecutive term of three years four months for a total of four years four months."

The trial court may strike the additional punishment for the street gang enhancement "in an unusual case where the interests of justice would best be served . . . ." (Pen. Code, § 186.22, subd. (g).) The trial court's discretion to strike the gang enhancement is abused where the court was not aware of its discretion, because an erroneous understanding of its discretionary power is not a true exercise of discretion. (*People v. Marquez* (1983) 143 Cal.App.3d 797, 803.)

30

However, we presume that the trial court was aware of and followed the applicable law, and this presumption extends to judicial exercises of discretion in sentencing. (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496.) Error must be affirmatively shown. (*Ibid*.) Defendants' affirmative showing of error is limited to the trial court's use of the phrase "as mandated" when imposing the sentence enhancement.

In this context, we conclude the phrase "as mandated" referred to the length of the enhanced term, rather than the imposition of the enhanced term. The trial court's language was taken verbatim from the probation report, which stated: "As to the Section 186.22 [subdivision] (b)(1) [Penal Code] allegation, which was found true, it is recommended the defendant's sentence be enhanced by a separate, consecutive term of ten (10) years as mandated." Had the probation report intended to convey that a term of enhancement was mandatory, it would not have "recommended" the enhancement, but stated that the enhanced term was mandatory. Instead, the language of the probation report was intended to convey that if the trial court accepted its "recommendation" to impose the enhancement, the mandated term was 10 years.

Our understanding of the trial court's phrasing is further reinforced by the fact that Camacho's trial counsel filed a statement in mitigation, in which he requested that the gang enhancements be stayed. This would have alerted the trial court that it had a choice in imposing the sentence. It nevertheless imposed the gang enhancement. In so doing, the trial court stressed that the nature of the crime was a gang crime, and that both Camacho and Hernandez had a history of criminal gang conduct.

We conclude the trial court was aware of its discretion to strike the gang enhancement, and did not abuse its discretion when it imposed the enhancement.

## VII
### Challenge to Fees is Forfeited

Riggins, joined by Camacho and Hernandez, argue the trial court erred when it imposed jail booking and classification fees because there was insufficient evidence of

31

ability to pay and the administrative cost of the fees.  Because none of the defendants raised this issue below, it is forfeited.

The trial court imposed a main jail booking fee and a main jail classification fee pursuant to Government Code section 29550.2 on each defendant.  Government Code section 29550.2 provides for payment of such fees in an amount not to exceed the actual administrative costs if the defendant has the ability to pay.

Defendants claim the argument is cognizable on appeal despite the failure to object to the fees below because the challenge is to the sufficiency of the evidence to support the judgment.  Subsequent to the completion of briefing in this case, the Supreme Court decided *People v. McCullough* (2013) 56 Cal.4th 589, which held "that a defendant who fails to contest the booking fee when the court imposes it forfeits the right to challenge it on appeal." (*Id*. at p. 591.)  Accordingly, defendants forfeited the claim when they failed to object to the imposition of the fees below.

## VIII
### Multiple Murder Special Circumstance as to Riggins

In counts one and two, Riggins was charged and found guilty of first degree murder with a multiple murder special circumstance finding pursuant to Penal Code section 190.2 subdivision (a)(3).  Defendant is correct that only one murder special circumstance should have been alleged and found true.  (*People v. Halvorsen* (2007) 42 Cal.4th 379, 422.)  The remedy is to strike the superfluous finding.  (*Ibid*.)

## DISPOSITION

We remand the matter to the trial court with directions to: (1)  modify Riggins's sentence on count three (attempted willful, deliberate, and premeditated murder), to life in prison with the possibility of parole; (2)  strike the terms imposed against Riggins pursuant to Penal Code section 186.22, subdivision (b)(5) and note a 15-year minimum parole eligibility date for each of the Penal Code section 186.22, subdivision (b)(5) enhancements; (3) vacate one of Riggins's two multiple-murder special-circumstance

32

findings; (4) modify the count three gang enhancement as to Camacho and Hernandez from three years and four months to one year and eight months; and (5) forward copies of the amended abstracts to the Department of Corrections and Rehabilitation.  In all other respects the judgment is affirmed.

    BLEASE    , Acting P. J.

We concur:

    HULL    , J.

    MAURO    , J.